IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>7112 AZTEC ROAD NE, ALBUQUERQUE, )<br>NEW MEXICO )<br>)<br>Defendant-in-rem. )<br>) | Civ. No. 1:25-cv-130 |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, brings this complaint in accordance with Supplemental Rule G(2) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions and alleges as follows:

### NATURE OF THE ACTION

1. This is a civil action *in rem* to forfeit and condemn to the use and benefit of the United States of America property involved in violations of 18 U.S.C. § 1956 that is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1).

### DEFENDANTS *IN REM*

2. The defendant *in rem* consists of the following real property, with improvements thereon and appurtenances thereto:

   7112 Aztec Road NE, Albuquerque, Bernalillo County, New Mexico; 87110, more specifically described as follows:

   LOT NUMBERED EIGHT (8) IN BLOCK LETTERED "F" OF LA JOLLA PARK, AN ADDITION TO THE CITY OF ALBUQUERQUE, NEW MEXICO, AS THE SAME IS SHOWN AND DESIGNATED ON THE PLAT THEREOF, FILED IN THE OFFICE OF THE COUNTY CLERK OF BERNALILLO COUNTY, NEW MEXICO, ON JANUARY 7, 1959, IN VOLUME D2, FOLIO 71.

   (hereinafter the "Defendant Property")

3. The Defendant Property is now, and during the pendency of this action will be, in the jurisdiction of this Court.

4. Upon the filing of this complaint, the United States will post notice of the complaint on Defendant Property as required by 18 U.S.C. § 985(c)(1)(B). Posting of notice on Defendant Property establishes *in rem* jurisdiction over the property. The United States also will service notice of the complaint, along with a copy of the complaint, on the property owner(s) of the Defendant Property pursuant to Supplement Rule G(4)(b) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, 18 U.S.C. § 985 (c)(1)(C), and/or 18 U.S.C. § 985(c)(2).

## JURISDICTION AND VENUE

5. The United States District Court for the District of New Mexico has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355(a), and 1356.

6. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395, as acts or omissions giving rise to the forfeiture took place in this district and the property is found within the District of New Mexico.

## FACTS

### Introduction

### New Mexico Driving While Intoxicated (DWI) Laws

7. New Mexico has a series of state laws designed to target the unlawful driving of vehicles while under the influence of alcohol or drugs. *See* New Mexico Statutes Annotated (NMSA) 1978, § 66-8-101, *et seq.* (2016). Under New Mexico state law, a person has committed DWI if they operated a vehicle while impaired to the slightest degree, *see* NMSA 1978, § 66-8-102(A) (2016), or with a blood alcohol concentration (BAC) greater than .08, *see* NMSA 1978, § 66-8-102(C). A person has committed aggravated DWI if (1) their BAC is .16 or greater, (2) they caused injury as a result of their unlawful operation of a motor vehicle, or (3) they refused to submit to blood or breath testing. *See* NMSA 1978, §§ 66-8-102(D), 66-8-107(A). (Collectively, these are referred to as DWI Offenders.)

8. DWI offenses that do not involve injury or death to another are generally misdemeanors, unless the offender has at least three prior DWI convictions (resulting in the next DWI arrest being a state felony). *See* NMSA 1978, § 66-8-102(F)-(K). The range of imprisonment depends on an offender's prior DWI conviction history, but all DWI convictions require payment of associated court fees in addition to potential fines. Additionally, if a person is convicted of DWI, they must have an ignition interlock installed in their vehicle (or in any vehicle driven by them).

9. To initiate a state court misdemeanor DWI offense, the arresting officer either files a criminal complaint immediately following the arrest and takes the offender into custody, *see* New Mexico State Court Rules (NMRA) 7-201, or later files a criminal complaint but seeks a summons from the state court, *see id.*, *see also* NMRA 7-204. If the DWI Offender is hospitalized or otherwise unable to be taken into custody immediately following the DWI incident, the officer may later file the criminal complaint and seek a summons from the court.

10. Prior to March 2022, once the New Mexico state criminal DWI charges were initiated, all parties, including a defendant, were entitled to conduct a pretrial interview (PTI) of all witnesses, including law enforcement officers. *See* NMRA 7-504(1). To arrange the PTI, the parties were required to confer and agree in good faith to arrange a date and location for the PTI. If that was unsuccessful, defense counsel could seek a subpoena from the state court for a PTI. Typically, the initial PTI would be arranged at the law enforcement office and, if the officer did not attend, defense counsel could request a subpoena for the PTI at another location, including the defense attorney's law firm. On March 24, 2022, the New Mexico State Supreme Court entered an order temporarily suspending all PTIs in cases occurring in the Bernalillo County Metropolitan Court, which included all misdemeanor DWI arrests in Bernalillo County. *See* New Mexico Supreme Court Order NO. 22-8500-016. Because of this, since March 2022, there have not been PTIs for misdemeanor DWI cases that occur in Bernalillo County.

New Mexico Motor Vehicle Division (MVD) Administrative Proceedings

11. For DWI Offenders with New Mexico driver's licenses, in addition to the criminal case, there is a separate administrative process handled by the New Mexico MVD to determine if the DWI Offender's driver's license should be revoked (the "MVD hearing"). *See* NMSA 1978, § 66-8-111. Under New Mexico state law, the officer must immediately provide the DWI Offender written notice of revocation of the DWI Offender's driver's license and of the right to an administrative hearing. *See id.* at § 66-8-111.1(A). This written notice serves as the offender's temporary license for twenty days or, if the DWI Offender requests an administrative hearing, until after the order is entered following that hearing. *See id.* at § 66-8-111.1(B). If the DWI Offender requests a hearing, an administrative hearing is held, at which the officer must appear and provide testimony that there were "reasonable grounds to believe that the person had been driving a motor vehicle within this state while under the influence of intoxicating liquor or drugs", the DWI Offender was arrested, and the results of the blood or breath test (or refusal). *See id.* at § 66-8-112(F). If the officer does so, the MVD then suspends the DWI Offender's driver's license.

New Mexico DWI Law Enforcement

12. Multiple policing agencies share in the enforcement of DWI laws within and around the Albuquerque area including, but not limited to, the Albuquerque Police Department (APD), the New Mexico State Police (NMSP), and the Bernalillo County Sheriff's Office (BCSO). Each agency has its own internal guidelines related to officer and deputy conduct and behavior.

13. APD has a Personnel Code of Conduct that requires all officers to "act in a manner that is above reproach. This includes avoiding behavior that may cast doubt on their integrity, honesty, moral judgment, or character; that tends to bring discredit to the Department; or that impairs the Department's efficient and effective operation." APD Standard Operating Procedure 1-1-6(A)(1).

14. NMSP has a Standard of Conduct applicable to all commissioned officers, which requires all employees to "conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the department. Conduct unbecoming an employee shall include that which brings the department into disrepute or reflects discredit upon the employee as a member of the department, or that which impairs the operation or efficiency of the department or employee." NMSP Standard of Conduct, New Mexico Administrative Code (NMAC) 10.5.100.8(C). Financial gain by employees is prohibited, and employees, including law enforcements officers, are directed that they shall not "accept gifts, gratuities, bribes, loans or rewards which are intended to influence the employee in the performance of their duties and responsibilities or for tasks performed as part of their duties." NMAC 10.5.100.8(O).

15. BCSO has a Code of Conduct that provides, "Personnel shall conduct themselves both on and off-duty in such a manner as to reflect most favorably on the Department." BCSO Code of Conduct 109-1(F). The Code prohibits conduct that "could bring the Office and/or individual Deputy or employee into disrepute based on actions or behaviors displayed by the employee" and that "impairs the operation or efficiency of the Office." BCSO Code of Conduct 109-1(G).

New Mexico Rules of Professional Conduct for Attorneys

16. Attorneys licensed to practice law in the State of New Mexico are governed by Rules of Professional Conduct, New Mexico Rules Annotated (NMRA), Rules of Professional Conduct, Rule 16-100, *et seq*. "A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." NMRA, Rules of Prof. Conduct, Preamble. "A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials.

5

While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process." *Id.* "The legal profession's relative autonomy carries with it special responsibilities of self-government. The profession has a responsibility to assure that its regulations are conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar. Every lawyer is responsible for observance of the Rules of Professional Conduct. A lawyer should also aid in securing their observance by other lawyers. Neglect of these responsibilities compromises the independence of the profession and the public interest that it serves." *Id.*

## The Defendant Property

17. THOMAS J. CLEAR III was a criminal defense attorney who owned a law firm that specialized in defending persons charged with DWI offenses. The law firm operated out of the Defendant Property.

## The RICO Enterprise

18. At all times relevant to this complaint, CLEAR and other persons and entities known and unknown, constituted an enterprise, as that term is defined in 18 U.S.C. § 1961(4), that is, a group of individuals and entities associated in fact (referred to herein as "the DWI Enterprise"). The DWI Enterprise was engaged in, and its activities affected, interstate commerce. The DWI Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise.

19. The DWI Enterprise was comprised of both persons and a law firm. CLEAR owned the law firm. RICARDO MENDEZ worked as an investigator for the law firm. To develop clients and business for the DWI Enterprise, and for pecuniary gain and other benefits, MENDEZ, officers and deputies with APD, NMSP, and BCSO (collectively, the Officer Members), and I conspired to cause dismissal of criminal charges and administrative proceedings against persons arrested for DWI offenses.

Purposes of the DWI Enterprise

20. The purposes of the DWI Enterprise included, but were not limited to, the following:

    a. To generate, preserve, and protect profits of the DWI Enterprise and its members and associates;

    b. To develop a referral system from the Officer Members, who would refer new DWI arrests directly to members and associates of the DWI Enterprise so that the DWI Offender could be solicited to retain CLEAR as an attorney, which would lead to increased profits for members and associates of the DWI Enterprise;

    c. To grow a client base willing to pay higher legal fees in exchange for the successful resolution of their DWI offense;

    d. To develop a client referral system based on the illegally obtained dismissals of DWI cases, thereby further promoting the success of the DWI Enterprise;

    e. To provide free or discounted legal services to law enforcement officers to develop goodwill and encourage the officers' participation in the DWI Enterprise's scheme;

    f. To protect, preserve, and enhance CLEAR's status and reputation as an attorney, thereby allowing CLEAR to continue growth of the DWI Enterprise;

    g. To conceal and protect the criminal activities of the DWI Enterprise and its members and associates from detection, investigation, and prosecution; and

    h. To enrich the members and associates of the DWI Enterprise.

The Racketeering Conspiracy

21. From at least in or around 2007 through on or about January 18, 2024, in Bernalillo County, in the District of New Mexico, and elsewhere, CLEAR along with others, known and unknown, being persons employed by and associated with the DWI Enterprise, an enterprise which engaged in, and the activities of which affected, interstate commerce, knowingly, unlawfully, and willfully conspired to violate 18 U.S.C. § 1962(c), that is, to conduct

and participate, directly and indirectly, in the conduct of the affairs of the DWI Enterprise through a pattern of racketeering activity, as that term is defined by 18 U.S.C. § 1961(1) and (5), consisting of:

      a.      multiple acts involving bribery, chargeable under NMSA 1978, § 30-24-1, 30-24-2, 30-28-1, and 30-28-2; and

      b.      multiple acts indictable under 18 U.S.C. § 1951 (relating to interference with commerce by extortion under color of official right); 18 U.S.C. § 2 (aiding and abetting).

22.      It was part of the conspiracy that CLEAR agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the DWI Enterprise.

<u>Manner and Means of the Racketeering Conspiracy</u>

23.      The manner and means by which the conspirators agreed to conduct and participate in the conduct of the affairs of the DWI Enterprise included, among others, the following:

      c.      As part of the racketeering conspiracy, each member and associate of the DWI Enterprise served a different role designed to manipulate the DWI criminal and administrative proceedings to enrich the DWI Enterprise members and associates and to further the DWI Enterprise.

      d.      CLEAR, a lawyer, owned a criminal defense law firm located in Albuquerque, New Mexico, that specialized in DWI defense. CLEAR used his criminal defense law firm to conduct, conceal, and otherwise assist himself and other members and associates of the DWI Enterprise in their criminal activities. CLEAR also appeared at the criminal and administrative proceedings for cases that were part of the scheme and moved to dismiss the proceedings based on the Officer Members' intentional failures to appear at required PTIs, MVD hearings, and/or trials (collectively referred to as "settings").

    e.  MENDEZ worked for CLEAR's law firm as an investigator and handled the day-to-day coordination of the scheme. CLEAR structured the DWI Enterprise so that MENDEZ was the primary person working directly with the Officer Members.

    f.  The Officer Members participated in the DWI Enterprise by intentionally failing to appear at required criminal and administrative settings associated with the DWI-related arrest, allowing CLEAR to move to dismiss the proceedings. Some of the Officer Members also recruited new Officer Members and referred DWI Offenders to CLEAR and MENDEZ, thereby furthering the interests of the DWI Enterprise, as discussed further below.

    g.  To execute the scheme, the DWI Enterprise members and associates developed a system for DWI Offenders who retained CLEAR to coordinate the scheduling of the MVD hearing and criminal settings to ensure that the Officer Members would be able to miss the required settings, which, in turn, allowed CLEAR to use the Officer Members' failure to appear as the basis to request dismissal of the proceedings (even though CLEAR was aware that CLEAR and MENDEZ had paid the Officer Members to not appear).

    h.  The DWI Enterprise targeted DWI Offenders, both aware and unaware of the scheme, who retained CLEAR as their attorney following their DWI arrests. CLEAR and/or MENDEZ consulted with the DWI Offender and strongly encouraged that the attorney retainer fee be paid in cash. When the DWI Offender paid the cash retainer, CLEAR and MENDEZ were paid cash in addition to their law firm salary. In addition, the Officer Members were often paid in cash but, at times, also received other benefits and things of value, including but not limited to free legal services, gift cards, hotel rooms, and other gifts. MENDEZ typically handled communications with Officer Members to negotiate payment amounts and to arrange meetings to exchange payments. However, on occasion, CLEAR paid Officer Members directly.

    i.  In terms of the payment amount the DWI Enterprise members and associates received, there was generally a set amount, but there were also exceptions depending on various factors, including the circumstances of the DWI arrest, the DWI Offender's criminal

9

history (specifically if the offender was facing felony DWI charges based on their prior DWI convictions), the amount of money the DWI Offender appeared to have, and the DWI Offender's personal relation to DWI Enterprise members and associates.

j.     CLEAR also provided free or significantly discounted legal services for the Officer Members and their family members in exchange for the Officer Members' non-appearance at required administrative and criminal settings and to develop goodwill between the Officer Members and other members and associates of the DWI Enterprise.

k.     Once the DWI Offender retained CLEAR as their attorney, CLEAR, MENDEZ, and the Officer Members would coordinate the Officer Members' non-appearance at required settings on the state criminal case and the MVD administrative proceeding. When the Officer Members failed to appear as arranged, CLEAR moved to dismiss the criminal cases and the MVD proceedings. Because the Officer Members were necessary witnesses and because the Officer Members did not appear as required, the proceedings would be dismissed. Because the state criminal charges were dismissed, the fines, fees, and interlock requirement that would otherwise have applied to the DWI conviction were not imposed. In addition, because the MVD proceedings were dismissed, the DWI Offenders' driver's licenses were not revoked, allowing the DWI Offenders to continue to drive without restriction.

l.     As to state criminal cases prior to March 2022, CLEAR, MENDEZ, and the Officer Members agreed that the Officer Members would not appear at the PTIs (either the initial PTI at the law enforcement office or the subpoenaed PTI). Before March 2022, an officer missing a PTI, or multiple PTIs, typically guaranteed the dismissal of a DWI case because, once requested by a defendant, officer PTIs became a required part of state court discovery. Dismissal of the state criminal case often occurred as a sanction for the State's discovery violation.

m.     The suspension of PTIs in misdemeanor DWI cases in March 2022 altered how CLEAR, MENDEZ, and Officer Members worked to guarantee dismissal of state criminal DWI-related offenses. No longer able to manipulate Officer Members' appearances at PTIs, co-

CLEAR, MENDEZ, and the Officer Members agreed that Officer Members would not appear at the criminal DWI motion hearings or trial settings. When the Officer Members failed to appear at court, CLEAR moved to dismiss the cases because necessary witnesses for the state would not be present.

      n.      As the scheme evolved over the years, several Officer Members employed by APD began referring cases to CLEAR and MENDEZ to secure and increase payments to themselves and to the DWI Enterprise and to grow the DWI Enterprise. Officer Members retained MVD paperwork and driver's licenses, and then provided them to MENDEZ. Officer Members also provided MENDEZ the DWI Offender's phone number, if obtained as part of the DWI incident. Typically, MENDEZ would reach out to the DWI Offenders referred by the Officer Members and alert the DWI Offenders that MENDEZ knew about the DWI arrest (even though often this was before any documentation about the arrest was publicly available). MENDEZ arranged a time for the DWI Offenders to meet with MENDEZ and/or CLEAR, typically at CLEAR's law firm. MENDEZ and/or CLEAR showed the DWI Offenders their driver's license (which had been seized in connection to the DWI arrest). MENDEZ and/or CLEAR would then inform the DWI Offenders that, if they hired CLEAR as their attorney, they would not have to worry about the DWI arrest. At times, MENDEZ and/or CLEAR would guarantee that the DWI criminal case and MVD process would be dismissed. If the DWI Offenders did not retain CLEAR as their lawyer, the Officer Members would typically proceed with the DWI case as required, thereby usually securing a DWI conviction against the DWI Offenders.

      o.      While Officer Members of the DWI Enterprise included officers from APD, BCSO, and NMSP, APD had the most Officer Members. To ensure that APD DWI officers were able to keep participating in the scheme over the years, other APD Officers Members who worked in the DWI unit and were part of the scheme helped recruit and train the next generation of Officer Members. The more senior APD Officer Members helped recruit

officers to join the DWI Enterprise, frequently personally introduced them to MENDEZ, and often assured the Officer Member recruit about the success of the DWI Enterprise. More senior APD Officer Members also provided MENDEZ the personal cell phone numbers for the recruits, which allowed MENDEZ direct access to the newly recruited Officer Members. In addition, more senior APD Officer Members told MENDEZ which officers the DWI Enterprise should avoid (meaning which officers were likely to report the DWI Enterprise's criminal activity to internal affairs or other law enforcement authorities). In recent years, at times Officer Members were paid a "referral fee" from MENDEZ and CLEAR as payment for having recruited another Officer Member to join the DWI Enterprise.

p. When MENDEZ met with the recruits to bring them into the DWI Enterprise, MENDEZ often discussed many of the other Officers Members who had been and were part of the DWI Enterprise from the different law enforcement agencies (APD, NMSP, and BCSO). This allowed the recruit to feel more comfortable joining the DWI Enterprise because of the number of senior, and often high-ranking, officers who were also Officer Members. This generational participation, particularly within APD, allowed the DWI Enterprise to take root amongst almost the entire APD DWI unit over a lengthy period of time. The more senior APD Officer Members were also asked by MENDEZ, CLEAR, and/or other Officer Members to use their positions and influence within APD to try to ensure that the DWI Officer Members were not investigated or disciplined in connection with their illegal activity.

q. Officer Members would also sometimes discuss with each other the continued success of the DWI Enterprise to ensure that it remained successful, profitable, and undiscovered, thereby allowing the DWI Enterprise to continue undetected.

r. Officer Members played an essential role in the DWI Enterprise and racketeering conspiracy. Their cooperation, coordination, and agreement to act, or failure to act, in exchange for a share of the profits of the DWI Enterprise, enabled CLEAR's clients to avoid

criminal and administrative consequences related to their DWI arrests. This allowed CLEAR and MENDEZ to increase their client business, thereby benefiting the DWI Enterprise as a whole.

s. The DWI Enterprise members and associates used cellular telephones to coordinate the operation of the scheme and to conduct the affairs of the DWI Enterprise. The DWI Enterprise members and associates used cellular telephones to confer about new DWI arrests, to discuss whether the DWI Offenders would be able to pay the legal fees associated with CLEAR's legal representation, to coordinate the scheduling of the state criminal or MVD settings so that the Officer Members had an excuse to not attend the settings, to coordinate payment to the Officer Members for failing to appear, and for other purposes.

t. The DWI Enterprise members and associates also used e-mail accounts to coordinate the operation of the scheme and to conduct the affairs of the DWI Enterprise. The DWI Enterprise members and associates sent and received e-mails to discuss the new DWI-related arrests, to provide paperwork associated with the DWI-related arrest to facilitate CLEAR and/or MENDEZ's solicitation to hire CLEAR as their attorney, and for other purposes.

u. The DWI Enterprise members and associates frequently used coded language in their communications to avoid detection and criminal prosecution.

### The Defendant Property's Facilitation of Money Laundering

24. As discussed above, DWI Offenders were strongly encouraged to pay retainer fees in cash, and many of the cash payments were made by DWI Offenders at the Defendant Property. CLEAR then used those cash payments, in part, to pay MENDEZ cash in addition to MENDEZ's law firm salary. CLEAR instructed MENDEZ not to deposit the cash payments into a bank account to avoid detection of the scheme. CLEAR further instructed MENDEZ to convey to the Officer Members that they also should not deposit the cash received from CLEAR and MENDEZ into bank accounts.

25. On occasion, MENDEZ met with officers being recruited to join the DWI Enterprise at the Defendant Property, though some of the recruitment meetings occurred at

locations away from the Defendant Property. During the recruitment meetings, MENDEZ would convey the rules for participating in the DWI Enterprise, and one of the rules was to avoid depositing cash into the Officer Members' bank accounts.

26. Cash payments from CLEAR and MENDEZ were made to the Officer Members both at the Defendant Property and at locations away from the Defendant Property.

### FIRST CLAIM FOR RELIEF

27. The United States incorporates by reference the allegations in paragraphs 1 through 26 as though fully set forth herein.

28. Title 18, United States Code, Section 981(a)(1) subjects to forfeiture any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property.

29. The Defendant Property was involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956 and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1).

WHEREFORE: Plaintiff seeks forfeiture of all Defendant Property to Plaintiff, determination of the validity and priority of claims of the Claimants and any Unknown Claimants to the Defendant Property, costs, and expenses of seizure and of these proceedings, and any other just and proper relief.

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically filed 02/07/25*
STEPHEN R. KOTZ
Assistant U.S. Attorney
201 Third Street, Suite 900
Albuquerque, New Mexico 87103
(505) 346-7274

## 28 U.S.C. § 1746 Declaration

I am a Special Agent with the Federal Bureau of Investigation who has read the contents of the Complaint for Forfeiture *In Rem* to which this Declaration is attached; and the statements contained in the complaint are true to the best of my knowledge and belief.

I declare under penalty of perjury and the laws of the United States of America that this Declaration is true and correct, except as to matters stated on information and belief, and as to those matters, I believe them to be true.

Dated: February 6, 2025

_____
Zackari S. Mercado
Federal Bureau of Investigation